**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| HALL WHITE, | : | Civil Action No. 06-5177 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **OPINION** |
| CITY OF TRENTON, TRENTON POLICE | : | |
| DEPARTMENT, CHIEF OF POLICE, et al., | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

**WOLFSON, United States District Judge:**

Presently before the Court is a Motion for Summary Judgment brought by Defendants City of Trenton ("the City") and the former Director of Police J. Santiago ("Director Santiago")(collectively, the "City Defendants") pursuant to Fed.R.Civ.P. 56 in connection with Plaintiff Hall White's ("Plaintiff") § 1983 claims that the City Defendants violated his constitutional rights by failing to adequately track excessive force complaints and discipline TPD officers Rossetti, Fennimore, Kmiec, Kurfuss, Miller, and Gonzales (collectively, "TPD Officers"), proximately causing the TPD Officers to falsely arrest Plaintiff on two separate occasions and to use excessive force that resulted in his injuries. In addition, Plaintiff brings claims against Officers Rossetti, Fennimore, and Miller (collectively, "Officer Defendants") for their roles in one of the aforesaid arrests, and the

1

Officer Defendants move for summary judgment on his claims against them.

For the reasons more fully set forth below, the Officer Defendants' motion for summary judgment is granted in part, denied in part.  Summary judgment is denied on Plaintiff's excessive force claim, Count IV, against Defendants Rossetti, Fennimore, and Miller.  Summary judgment is granted on Count V of the Amended Complaint, and summary judgment is granted on the false arrest claim, Count VI, against Defendants Fennimore and Miller.  The false arrest claim against Defendant Rossetti remains.

As for the City Defendants' motion for summary judgment, that motion is also granted in part and denied in part.  Summary judgment is granted on Counts V and VI.  As to Count III, the claims against Director Santiago in his official capacity regarding the November 8, 2004 incident are denied but granted with regard to the February 7, 2005 incident; summary judgment is granted on all claims against Director Santiago in his individual capacity.  As for Count III against the City, summary judgment is denied on the November 8, 2008 incident but granted with respect to the February 7, 2005 incident.

## I.    BACKGROUND

This civil rights action has a protracted procedural history.  However, the facts relevant to the instant motion are relatively straightforward and many of them were addressed in my opinion of May 9, 2009, in which I denied the City Defendant's prior motion for partial summary judgment.  I repeat the facts relevant to this motion in general terms, and provide more detailed facts in my analysis where relevant.

Plaintiff's claims arise out of two separate arrests during which Plaintiff alleges the

TPD Officers used excessive force and arrested him without probable cause, in one case filing false aggravated assault charges against him.  The first incident took place on November 8, 2004, when Officers Kmiec and Kurfuss were detailed to a Trenton residence based on a report that an intoxicated individual, later identified as Plaintiff, was trying to kick in the front door.  Certification of Kimberley M. Wilson ("Wilson Cert."), ¶ 9, Exh. G at COT 081.  Kmiec and Kurfuss physically restrained Plaintiff[1] and arrested him for obstructing the administration of law.  While effectuating the arrest, Plaintiff alleges Kmiec and/or Kurfuss both physically and verbally abused him, at one point telling him to "shut the fuck up."  White Dep. Tr. 215:12-13.  No other TPD officers, including Director Santiago, were present at the scene.

Plaintiff was transported to TPD Headquarters and placed in lock-up.  Ultimately, all charges against Plaintiff were dismissed.  Plaintiff filed a Notice of Tort Claim against the City on February 4, 2005.  Plaintiff testified he did not file a complaint with TPD's Internal Affairs regarding the November 2004 arrest because he had already filed a Notice of Tort Claim.  White Dep. Tr. 225:23-226:2.

On February 7, 2005, Plaintiff was again arrested, this time for improper behavior, and transported to TPD Headquarters.  Plaintiff alleges that during his arrest and subsequent 24-day detention, the Officer Defendants, Officers Fennimore, Rossetti, and Miller, illegally assaulted him, while others failed to intervene on his behalf.  Am.Compl., ¶¶ 34 -37.  Plaintiff maintains that the Defendant Officers then conspired to cover up their

---

[1]        Officers Kmiec and Kurfuss are not named defendants in this action.

wrongdoing by filing false aggravated assault charges against him that alleged he attacked the officers while he was in the detention area.  Id. at ¶ 46.  Rossetti testified he discharged pepper spray onto Plaintiff's face while Plaintiff was in his cell and then did not subsequently wash it off Plaintiff's face.   Rossetti Dep. Tr. 91:15-17; 105:17-20.  Miller was also present in Plaintiff's cell and did not attempt to wash the spray off Plaintiff's face. Videotapes were made of the detention area where Plaintiff was held, but were not preserved.  The charges against Plaintiff which alleged an assault on the Defendant Officers were later dismissed.  No investigation into the Defendant Officers' use of force was conducted as a result of the charges being dismissed. Again, Plaintiff testified that he did not file a complaint with Internal Affairs regarding this arrest.

TPD Internal Affairs is responsible for overseeing and investigating excessive force complaints.  Santiago Dep. Tr. 12:17-23.  At the time of the alleged incidents, TPD Internal Affairs reported directly to Director Santiago.  Id. at 12:16-23.  Internal Affairs complaints were generated from several sources, including letters to Director Santiago, walk-ins, and referrals from other agencies such as the New Jersey Attorney General's Office and the Mercer County Prosecutor's Office.  Id. at 12:24 - 13:6.  Notably, the TPD did not have a policy of investigating excessive force allegations made through Notices of Tort Claims.

Director Santiago was the policy-maker for the City regarding police discipline and investigations into misconduct at the time Plaintiff was arrested.  Id. at 11:11-18.  He assumed this position in 2003.  Id. at 7:2.  Director Santiago testified that he believed the then-current TPD policy gave civilian complainants wide discretion in reporting incidents

of police misconduct and that these policies were "more than adequate" to deal with such issues. Id. at 16:3-8;18:16-21. For this reason, he did not believe it was necessary to retrieve Notices of Tort Claims that alleged excessive use of force. Id. at 15:7 to 16:8. He further testified that the TPD policy complied with the Attorney General's guidelines and that it was monitored by the Mercer County prosecutor's office, which received an annual report from TPD Internal Affairs. Id. at 18:16-21;19:10-18. According to the annual Internal Affairs Summary Report Form (the "Report"), there appear to be a number of excessive force complaints for which there was no resolution.

Plaintiff filed a complaint with this Court on October 27, 2006 and, thereafter, on August 14, 2007, Plaintiff filed his First Amended Complaint and Jury Demand (the "Amended Complaint"). Through a joint application to this Court, Counts I and II of the Amended Complaint were dismissed on September 12, 2008. In 2009, the City Defendants filed a motion for partial summary judgment to dismiss Counts III, IV, and VII of the Amended Complaint. The Court granted that motion in part and denied it in part, limiting Plaintiff's claims to a municipal custom of failing to effectively track excessive force complaints and discipline the officers involved in them. See White v. City of Trenton, No. 06-05177, 2009 WL 1442765, (D.N.J. May 20, 2009). The case was administratively terminated for a time while new and substitute counsel was appointed for Plaintiff.[2]

---

[2]    Specifically, on September 15, 2009, Plaintiff requested the appointment of pro bono counsel and his pro bono application was granted on October 27, 2009. However, his initial pro bono counsel was unable to complete the case, thus, the Court administratively terminated the case on March 1, 2010, while substitute pro bono counsel was sought. New counsel was appointed on April 23, 2010.

The City Defendants now move for summary judgment on this remaining aspect of Plaintiff's claims, including the claims against Director Santiago in both his official and personal capacities.  In addition, the Officer Defendants now move for summary judgment on Plaintiff's excessive force claim (Count IV), Plaintiff's claim that the Officer Defendants were "motivated by personal animus" since White filed a Notice of Claim regarding the November 8, 2004 arrest (Count V), and Plaintiff's malicious prosecution claim (Count VI). For the following reasons, both sets of motions are granted in part and denied in part.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where the Court has determined that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 330 (1986). A "material fact" is one that could affect the outcome of a suit under the applicable rule of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disagreements over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses, and . . . that [the rule] should be interpreted in a way that allows it to accomplish this purpose." Celotex, 477 U.S. at 323-24. "[W]hen the record is such that it would not support a rational finding that an essential element of the non-moving party's claim or defense exists, summary judgment must be entered for the moving party." Turner v. Schering-Plough Corp., 901 F.2d 335, 341 (3d Cir. 1990).

The party moving for summary judgment has the burden of establishing that no

"genuine issue" exists. <u>Celotex</u>, 477 U.S. at 330. Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Fed. R. Civ. P. 56(e)</u>. To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324. In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>see also</u> <u>Ridgewood Bd. of Ed. v. Stokley</u>, 172 F.3d 238, 252 (3d Cir. 1999).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249.   A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party. <u>Id.</u> at 248. In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party." <u>Curley v. Klem</u>, 298 F.3d 271, 276-77 (3d Cir. 2002) (citations omitted).

## III.    DISCUSSION

In their motion for summary judgment, the Officer Defendants challenge the excessive force, improper animus, and malicious prosecution claims against them.  In addition to arguing that Plaintiff has failed to marshal adequate evidence in support of his claims, they contend that they are entitled to qualified immunity on the excessive force and

malicious prosecution claims.  According to the Supreme Court, the qualified immunity analysis has two prongs:  1) whether the official's conduct violated a constitutional or federal right; and 2) whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.  Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 815-16, 172 L.Ed.2d 565 (2009).  Courts have permission to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first. Id. at 818.  Exercising that discretion here, I will first address whether Plaintiff's claim that the Officer Defendants violated his constitutional rights survives summary judgment.

**A.     Officer Defendants' Motion for Summary Judgment**

**1.     Qualified Immunity**

With respect to the claims for malicious prosecution and excessive force, the Officer Defendants claim that they are entitled to qualified immunity.  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Ray v. Twp. of Warren, 626 F.3d 170, 173 (3d Cir. 2010) (quoting Pearson, 555 U.S. at 231).  If a reasonable officer is not on notice that his or her conduct under the circumstances is clearly unlawful, then application of qualified immunity is appropriate. Id. "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." Id.

As noted, the Supreme Court has established a two-part analysis to determine if qualified immunity is appropriate: 1) whether the official's conduct violated a constitutional

8

or federal right; and 2) whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.  <u>Pearson</u>, 129 S.Ct. at 815–16.  The right is "clearly established" only if the right was sufficiently clear that a reasonable official would understand that what he is doing violates that right.  <u>Ray</u>, 626 F.3d at 174.  Even if the officer made a mistake about the legal constraints on his actions, as long as the mistake was reasonable, qualified immunity still applies.  <u>Id.</u>  To avoid hindsight, the officers' actions are judged from the perspective of a reasonable officer under the circumstances.  <u>Id.</u>

In each of the claims below, the Court will determine whether qualified immunity applies to the individual defendants.

### a.  Excessive Force

Plaintiff's excessive force claims against the Officer Defendants, Officers Fennimore, Rossetti, and Miller, relate solely to the February 7, 2005 arrest.  According to Plaintiff, the officers used force beyond that necessary to effectuate his arrest, by knocking him to the ground and by stomping on him.  Plaintiff further contends that the officers used excessive force in placing him in his jail cell at the police station after he was arrested.  In contrast to Plaintiff's version of events, the Officer Defendants contend that they used only the force necessary to effectuate the arrest.  With respect to their treatment of White in the jail cell, they contend that he attempted to hang himself with his shirt, and that they had to cut him down in order to save his life.  Furthermore, they contend, White struggled with the officers while in the cell and they used only the force necessary to subdue him.

Claims of excessive force by police officers, in the context of an arrest, investigatory

stop, or other "seizure," should be analyzed under the Fourth Amendment.  Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004); Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To state a claim for excessive force under the Fourth Amendment, a plaintiff must show that a "seizure" occurred and that it was unreasonable. Curley v. Klem, 499 F.3d 199, 203 (3d Cir. 2007). The test of Fourth Amendment reasonableness of force used during seizure is whether, under the totality of the circumstances, officers' actions are objectively reasonable in light of facts and circumstances confronting them, without regard to their underlying intent or motivations.  Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004); Graham, 490 U.S. at 397.  An excessive force claim must be evaluated from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  Rivas, 365 F.3d at 198; Lamont v. New Jersey, No. 09–1845, 2011 WL 753856, at *5 (3d Cir. Mar.4, 2011) ("Monday morning quarterbacking is not allowed"). While the absence of physical injury does not necessarily signify that the force was not excessive, excessive force claims must be so egregious as to be constitutionally excessive, and the presence of some physical injury is relevant to that determination.  Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997).

Here, the Officer Defendants do not dispute that White was seized, arrested, and jailed.  Nor do the officers dispute that they used force in effectuating the arrest and inside of the jail cell.  Relatedly, Plaintiff presents the deposition testimony of two eye witnesses—Sheila Wallace and Anthony Davis—that corroborates his description of the degree of force used during the arrest.  See Wallace Dep. Tr. 22:9 - 23:22 (stating that, in

10

effectuating arrest, officers pushed White against a wall, threw him down, stepped on his hands, and beat him with a flashlight or night stick with a foot on the back of his neck); Davis Dep. Tr. 54:22-25 (stating that, in effectuating arrest, officers knocked White down to the ground); id. at 35:22-36:14 (further stating that "one police had hit him with the batons, some kind of baton, and one police had his chest — had his foot, with his knee on his chest and stuff").  These witnesses also testified that White was not aggressive with the officers, and that he did not provoke them.

The Officer Defendants primarily argue that summary judgment is appropriate because Plaintiff has not demonstrated that he sustained physical injury.  Officer Def. Open. Br. at 14.  As an initial matter, and contrary to Defendant's assertion, White has presented evidence of physical injury.  For example, in addition to his own deposition testimony stating that his prior neck injury and shoulder injuries were aggravated by the officers' use of force and that he sustained new injuries, he presents notes from a doctor's assessment on February 9, 2005, stating that White had "bilateral jaw pain" and a "swollen right ankle." Morelli Cert., Exh. V (County of Mercer, Department of Public Safety Progress Record). Furthermore, as the Officer Defendants acknowledge in their briefing, an x-ray of Plaintiff's right ankle revealed soft tissue swelling.

Moreover, Plaintiff submits a psychiatric report from Dr. Stephen S. Teich, M.D., in which he opines that White suffers from posttraumatic stress disorder as a result of the February 7, 2005 incident.  Specifically, he states in his report that, at the time of the incident, White

11

did not experience a mental disorder that affected his behavior or thinking process, and that the events of the [arrest] exacerbated and further caused the more severe development of a serious stress disorder, resulting in a chronic Posttraumatic Stress Disorder with Depression and Anxiety, with associated restrictions in his work and social life, that exist at the present time.

Gelber Cert., Exh. K at 2.

Even without this sort of evidence, the Officer Defendants' intimation that White may not succeed on his excessive force claim because he suffered de minimus injuries misinterprets Fourth Amendment excessive force law. "[S]ince at least 1997, the law with respect to Fourth Amendment excessive force claims has been clear: the presence or absence of a physical injury is but one relevant factor to consider in the Fourth Amendment excessive force analysis ...." Velius v. Township of Hamilton, 754 F.Supp.2d 689, 694 (D.N.J. 2010) (citing Sharrar, 128 F.3d at 822).   See also Gulley v. Elizabeth City Police Dept., 340 Fed.Appx. 108, (3d Cir. 2009) ("[T]he absence of physical injury does not necessarily signify that the force has not been excessive. Rather, it is simply one of the circumstances to be considered under the objective reasonableness standard ...."). The other relevant factors include "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Id. (quoting Sharrar, 128 F.3d at 822). In determining whether the degree of force used was reasonable, all of these factors must be considered.

In that connection, the Officer Defendants point to the following record evidence, which they suggest demonstrates the reasonableness of the officers' conduct.[3]  The Officer Defendants provide several medical records in support of their contention that Plaintiff has a long-standing psychiatric history.  Morelli Cert., Exh. B (Trenton Psychiatric Hospital Records dated October 20, 1995).  In addition, as White acknowledges in his deposition testimony, he had been drinking at the Pear Bar Tavern on the day of the arrest.  Further, once White arrived at the police station and was placed into a cell, the Officer Defendants assert that he twice attempted suicide.  They submit their own deposition in support of this fact, and they point to medical records from the days following the February 7th arrest in which records White is described as suicidal.  See e.g., Morelli Cert., Exh. V.  Additionally, they contend, the cell is a cramped space that "would barely be large enough to hold three adult males."  Officer Def. Open. Br. at 9.  See Morelli Cert., Exh. BB (photo of cell).

The Officer Defendants further point to record evidence suggesting that White did not suffer physical injury.   First, the Officer Defendants point to a booking photograph taken at the jail on February 7, 2011, which they contend shows White as being alert, awake, and uninjured.  See Morelli Cert., Exh. AA.  Second, the Officer Defendants note that the x-rays of Plaintiff's ankle do not show any fractures or dislocations, but only mild soft tissue swelling.  The Officer Defendants also suggest that the soft tissue swelling must have

---

[3]      The Court notes that the Officer Defendants failed to provide citations in their briefing to the record evidence.  Thus, the Court was required to attempt to match the Officer Defendants' arguments in their brief with their Statement of Material Facts and exhibits in order to determine if their arguments are adequately supported in the record.  The Court advises counsel to include the proper citations in briefs filed in the future.

subsided after only one day because a follow-up x-ray report dated February 11, 2005 stated that there was "no soft tissue swelling." Morelli Cert., Exh. V at 5. Finally, according to the Officer Defendants, Plaintiff's medical records "reveal a psychiatric patient who was not beaten, choked, or assaulted in any way. Instead the records reveal a psychiatric patient who was not taking his medication ...." Officer Def. Open. Br. at 9.

Based on the evidence presented by the parties, I conclude there exists a genuine issue of material fact as to whether the force used in effectuating White's arrest and inside of the jail cell was reasonable under the fourth amendment. While there is evidence that White had been drinking at the time of the arrest, and that he has a psychiatric history, neither of those facts demonstrate that White acted aggressively towards the officers, or that their safety was at risk. Rather, it is undisputed that White was unarmed at the time. In addition, White has presented the testimony of two eyewitnesses stating that the officers knocked him to the ground and that at least one officer stomped on him with his foot. Moreover, while the officers' deposition testimony states that White attempted suicide inside the jail cell, and medical reports indicate that he was suicidal, those same reports state that his right ankle was swollen and documented soft tissue swelling in that ankle. This aspect of the medical evidence could corroborate White's version of the events in the jail cell. In addition, as noted, while videotapes were made of the detention area where Plaintiff was held, those videotape were not preserved.

Thus, what remains is the parties two competing stories of what occurred and the medical evidence that may corroborate Plaintiff's version of events, depending on how

much weight is accorded the one x-ray report.  This sort of evidence will require credibility determinations and the weighing of evidence, both functions that are clearly within the province of the jury to decide.  Anderson, 477 U.S. at 254 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] [s]he is ruling on a motion for summary judgment.").

The law was clearly established at the time of the 2004 and 2005 incidents that "beating a suspect on the face and head, who is lying down and not resisting arrest, would constitute excessive force in violation of the Fourth Amendment." Gulley, 340 Fed.Appx. at 110 (citing Graham, 490 U.S. at 394-97).  Cf. Green v. New Jersey State Police, 246 Fed.Appx. 158, 163 (3d Cir. 2007) (holding that, with respect to a 2002 arrest involving force, "a reasonable officer would know, based on the Graham and Sharrar factors, that it would be excessive to grab and choke an arrestee's throat, especially before using lesser force; to hit him on the head twice with a flashlight; and to kick him when he is already restrained and on the ground.")  And, as explained above, Plaintiff has presented sufficient evidence from which a reasonable jury could conclude that, under the fourth amendment totality of the circumstances test, the Officer Defendants violated White's fourth amendment right to be free from excessive force.  Hence there remains a genuine issue of material fact that precludes the entry of summary judgment on the basis of qualified immunity.  See Giles v. Kearney, 571 F.3d 318, 327–28 (3d Cir. 2009); Boswell ex rel. Boswell v. Eoon, No. 10-3493, 2011 WL 5597429 (3d Cir. Nov. 17, 2011) ("The existence of a genuine issue of material fact . . . precludes an entry of summary judgment on the basis of qualified immunity.")  It also

15

precludes this Court from granting summary judgment on the excessive force claim.[4]

        **b.**    **False Arrest**

In Count VI of the Amended Complaint, Plaintiff alleges that the Officer Defendants falsely arrested him on February 7, 2005.[5] White was charged with obstruction of justice for his conduct outside of the Pear Tavern, and assault for his conduct inside the jail cell. Both charges were later dismissed. The Court notes, at the outset, that Plaintiff has not opposed summary judgment by Officers Fennimore and Miller on this claim. Accordingly, summary judgment is granted on the false arrest claims against those two defendants and the following discussion applies only to Officer Rossetti.

"The proper inquiry in a section 1983 claim based on false arrest or misuse of the criminal process is ... whether the arresting officers had probable cause to believe the person arrested had committed the offense." Dowling v. City of Phila., 855 F.2d 136, 141 (3d Cir. 1988). See Wallace v. Fegan, No. 11-3572, 2011 WL 6275996 (3d Cir. Dec. 16, 2011). Importantly, "where the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest."

--------------------------------

[4]    My ruling applies to all three Officer Defendants for their respective roles in White's arrest and jailing. Although White was unable to identify in his deposition testimony which role each officer played, Officer Rossetti testified that he was one of the arresting officers and Officers Fennimore and Miller testified that they were in the jail cell. See Rosetti Dep. 66:3-5; Miller Dep. 56:19 -23, 77:14-88:12; Fennimore Dep., 20:5 - 27:8. As there exist general issues of material fact as to the degree of force used during the arrest and as to whether the officers used force to injure White in the jail cell, qualified immunity may not be granted to any of the officers at this time.

[5]    While the Officer Defendants refer to this count as a malicious prosecution claim, I read the Amended Complaint as asserting a false arrest claim against the Officer Defendants. Plaintiff also describes this claim as a false arrest claim in his opposition brief.

Groman v. Twp. of Manalapan, 47 F.3d 628, 636 (3d Cir. 1995).

The Court finds that there exist genuine issues of material fact as to whether there existed probable cause for the officers to arrest White on an obstruction of justice charge, and the existence of open issues preclude this Court from granting qualified immunity to Officer Rossetti.  Plaintiff presents his own testimony, as well as the testimony of Sheila Wallace and Anthony Davis, that White was not combative and did not provoke the officers in any way.  See Wallace Dep. Tr. 22:9 - 23:22; Davis Dep. Tr. 51:6 - 60:14.   The witnesses describe White as complying with the officers' directives.  Yet, the witnesses further testify, the officers knocked him to the ground and stomped him.  This testimony, of course, stands in sharp contrast to Officer Rossetti's statement in his police report that White was attempting to reenter the bar to harm the bartender.  Morelli Cert., Exh. S at 3.  Nonetheless, a reasonable juror could credit the eyewitness testimony over Officer Rossetti's version of events and conclude that he lacked probable cause to arrest White for obstruction of justice. Therefore, the Court may not grant qualified immunity to Officer Rossetti, nor may the Court grant him summary judgment on Plaintiff's false arrest claim.

2.    **Count V**

In Count V of the Amended Complaint, Plaintiff alleges that the Officer Defendants were "motivated by . . . personal animus toward Plaintiff since the latter had filed a Notice of Claims [sic] against Defendants ...."  Am.Compl., ¶ 41.  Plaintiff does not oppose dismissal of this count in his opposition papers, therefore, the Officer Defendants' motion for summary judgment on this claim is granted.

17

**B.     The City Defendants' Motion for Summary Judgment**

A private cause of action may be brought under 42 U.S.C. § 1983 against any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or laws of the United States.  The statute, in and of itself, is not a source of substantive rights but provides "a method for vindicating federal rights elsewhere conferred."[6]  Graham v. Connor, 490 U.S. at 393-94.  The two requisite elements for recovery under 42 U.S.C. § 1983 are: "(1) the conduct complained of must have been done by some person acting under color of law; and (2) such conduct must have subjected the complainant to the deprivation of rights, privileges or immunities secured to him by the Constitution and laws of the United States." Basista v. Weir, 340 F.2d 74, 79 (3d Cir. 1965); Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). Thus, in order for a § 1983 claim to survive a motion for summary judgment, the Court must find a genuine issue of material fact as to one of the requisite elements.  See Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 790-91 (3d Cir.2000); Coletta v. Board of Freeholders, No. 06-585, 2007 WL 128893, at * 3 (D.N.J. Jan. 12, 2007).

When a suit against a municipality is based on § 1983, the municipality can only be

---

[6] 42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory, . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

18

liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom.  Monell v. Department of Social Services, 436 U.S. 658, 694 (1978); Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996).  A municipality cannot be held liable under 42 U.S.C. § 1983 on a respondeat superior theory of liability.  Monell, 436 U.S. at 694.  Thus, although the municipality may not be held liable for a constitutional tort under § 1983 on the theory of vicarious liability, it can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom.  Id.

The Third Circuit has articulated the distinctions between policies and customs:

> A government policy or custom can be established in two ways. Policy is made when a "decisionmaker possessing final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted); see also Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (same).  More specifically, liability may exist if a municipality acted in one of three ways: "[t]he first is where 'the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy.'  The second occurs where 'no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.'  Finally, a policy or custom may also exist where 'the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents

19

of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (internal citations omitted).

Here, Plaintiff avers the City Defendants are liable for the excessive force allegedly used on him based on a failure to adequately track excessive force complaints and to discipline its police officers. "Municipal liability for failure to train [or discipline] may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations involving the exercise of police discretion." City of Canton, Ohio v. Harris, 489 U.S. 378, 397 (1989) (O'CONNOR, J., concurring in part, dissenting in part.). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Bd. of the County Comm'Rs v. Brown, 520 U.S. 397, 405 (1997).

The Third Circuit has held that in order to prevail on a failure to train, discipline or control claim, a plaintiff must "show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." Montgomery v. De Simone, 159 F.3d 120, 127 (3d Cir. 1998)(citations omitted). Thus, the City Defendants may be liable for the constitutional violations of their police officers only to the extent that the injuries arose from their policies

or customs. <u>See</u>, <u>e.g.</u>, <u>Monell</u>,436 U.S. at 694-95; <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 971 (3d. Cir. 1996).

Plaintiff's municipal liability claim against the City relates to both of his arrests—the November 8, 2004 arrest and the February 7, 2005 arrest.  As noted, the Court previously granted the City Defendants partial summary judgment and limited Plaintiff's claim against the City to a municipal custom claim based on its alleged failure to effectively track excessive force complaints and discipline the officers involved in them.  In order for Plaintiff to defeat the City Defendants' motion for summary judgment, he must point to evidence in the record from which a reasonable jury could infer (i) that the City Defendants failed to adequately track excessive force complaints or discipline TPD officers in the proper discharge of their duties with respect to making arrests only with probable cause and not using excessive force; (ii) that these failures amounted to an unofficial custom that was conducted with deliberate indifference to citizens' constitutional rights; and (iii) that this deliberate indifference proximately caused the alleged false arrests and excessive force used on Plaintiff that resulted in his injuries.  I separately address Plaintiff's claims against the City and Defendant Santiago.

### 1.      Failure to Track Excessive Force Complaints

Count III of the Amended Complaint Plaintiff alleges that the City failed to effectively track excessive force complaints, and that this failure created a custom that proximately caused Plaintiff's injuries.  <u>See</u> Am.Compl., ¶ 26.  In my ruling on the City Defendants' prior motion for partial summary judgment, I rejected their argument that

Plaintiff has not presented sufficient evidence of a municipal custom.  My analysis focused on Director Santiago's deposition testimony and the Trenton Police Department's annual Internal Affairs Summary Report Form ("the Report") that suggested there were a number of excessive force complaints for which was no resolution.  Specifically, I reasoned that

> Plaintiff's claim that the City Defendants were, as a matter of custom, inattentive to allegations of serious police misconduct is supported by the testimony of Director Santiago and the Report.  Significantly, Director Santiago could not explain the Report, which could reasonably be read to indicate that there were a number of excessive force complaints for which there was no resolution:  the Report reveals that many cases pending at the end of the year on one report form did not carry over to the following year.  While Director Santiago could verify the accuracy of the Report, he was unable to explain how excessive force complaints were internally reviewed after they were dismissed by the Mercer County prosecutor's office as not being criminal in nature.  (Santiago Dep., T:65:2-19; 69:13-22.)  These cases appear to have fallen off the radar once they were released.

White v. City of Trenton, 2009 WL 1442765 at *6.

I further reasoned that, "if the City did not have a policy for effectively tracking complaints, officers in need of more training or discipline may not have received it."  Id. Moreover, I continued, "[a] reasonable jury could find the fact that many excessive force complaints appear to 'drop off the radar' was 'so likely to result in the violation of constitutional rights' as to demonstrate the City's deliberate indifference to its officers' use of force."  Id.  In that regard, I noted that the City's Reports indicated that only 1 out of 160 excessive force citizen complaints resulted in the finding of a rule violation.  Id.

In the instant motion, the City Defendants challenge this Court's interpretation of the

22

Report, arguing that the Report should not be read to reflect that excessive force complaints for one year are "dropped" and not carried over into the following year. Even if this is true, the City Defendants do not challenge the Court's conclusion that only one complaint was sustained out of 160. See City Def. Open. Br. at 25. Rather, they attempt to explain why only one complaint was sustained by pointing to testimony from Director Santiago's deposition that many excessive force internal affairs complaints are "he-said, she-said" cases without independent third-party testimony, and his testimony about the relationship between TPD's internal affairs and the Mercer County Prosecutor's office .

In this connection, Director Santiago states in his deposition that the excessive force complaints are difficult to sustain because they are "criminal by nature" and

> [d]eal[ ] with securing the approval of the prosecutor, who knows they have a standard of proof beyond a reasonable doubt to meet as opposed to disposing of it, [sic] a rule infraction which only requires a violation of — of our policy with a preponderance of evidence threshold.

Santiago Tr. 69:13-22. Santiago also states in his certification that, during his tenure at the TPD, all files were turned over to the prosecutor's office and that office would "review the entire file to determine whether it agreed with the Internal Affairs Bureau's disposition of the complaint and see whether it was appropriate to bring any potential criminal charges against any officer." Santiago Cert., ¶ 6. According to Santiago, this review process could take as long as three to five years. Id.

While Santiago avers that the prosecutor's office played a role in reviewing the Internal Affairs Bureau's disposition of excessive force complaints, his testimony says

23

nothing about the thoroughness of the prosecutor's investigation of those complaints that do no rise to the level of criminal conduct but nonetheless warrant disciplinary sanction. In contrast to criminal proceedings, where the beyond a reasonable doubt standard applies, the less-demanding preponderance of evidence standard applies to disciplinary proceedings. See In the Matter of Walter Zapoluch, 2010 N.J. CSC LEXIS 884 at 33-34 (citing Atkinson v. Parsekian, 37 N.J. 143 (1962); In re Polk, 90 N.J. 550 (1982)) (acknowledging that preponderance of the evidence standard applies to disciplinary proceedings).[7]   Moreover, Santiago avers that the prosecutor's review could take three to five years to complete.  The history of unsustained complaints, and this lengthy delay, may create an atmosphere of compliancy among the officers and the TPD.

The City Defendants also point to Director Santiago's testimony regarding a new tracking system he implemented in late 2004 to better track excessive force complaints.  He testified at his deposition that TPD implemented a computer software program titled "IA Pro," which he described as a "risk analysis or an early warning system [that] flags complaints . . . by officer, by the officer's supervisor, and what it essentially looks for is — is patterns."  Santiago Tr. 52:1-15.  He, further, indicated that the software tracks all complaints, whether sustained or not sustained.  Id.  Moreover, he explained that the old internal affairs records were transferred into the software and that the software has been in

---

[7]         In this connection, the New Jersey Attorney General's Internal Affairs Policy & Procedures, which the City Defendants claim they follow, see Santiago Cert. at ¶ 3, Exh. A, requires that internal affairs investigators "distinguish between those investigations involving potential criminal conduct and those investigations limited to administrative disciplinary infractions."  Supp. Wilson Cert., Exh. E ("IA Policy") at 11-36.

use since 2004.  Id.

As an initial matter, the Court acknowledges the reforms implemented by Director Santiago and TPD's adoption of the IA Pro system to address deficiencies in the prior system.  Director Santiago noted, in his testimony, that the level of civilian complaints has decreased by 48% since 2005.  Id. at 55:3-12.  In Director Santiago's view, this decrease shows "that we are more proactive and seeking out and trying to address things prophylactically, and that the measure is, you know, the number of people — walk-in complaints has dropped by almost 50 percent ...."  Id. at 55:13-20.

As Plaintiff correctly argues, however, Director Santiago's testimony does not unequivocally demonstrate that this new system was actually in effect at the time of the November 2004 incident.  He states in his testimony that the software was implemented in "the latter part of 2004."  Id. at 52:3.  Furthermore, Defendants have failed to produce a declaration by any individual responsible for implementation of the software system, or any other evidence regarding its implementation, to document the date it was put into effect.  Thus, there remains a genuine issue of material fact as to whether this system was in effect by the November 8, 2004 excessive force incident.

The same cannot be said, however, about the February 7, 2005 incident.  Based on Director Santiago's testimony, the new system was in place before the end of the 2004 calendar year.  And, importantly, Plaintiff has not challenged the new tracking system but focuses his challenge on the pre-IA Pro tracking system (or lack thereof).  Accordingly, Plaintiff's failure to adequately track claim must be limited solely to the November 8, 2004

incident.

In this connection, the Court notes that Plaintiff did not file a civilian complaint regarding this incident.  According to Plaintiff, he believed that his Notice of Claim filed pursuant to the New Jersey Tort Claims Act sufficed to notify TPD's internal affairs.  While Plaintiff was incorrect in his assumption, that he failed to file a citizen complaint does not alter may analysis.  His <u>Monell</u> claim against the City is based on the theory that the City had a custom of not adequately tracking complaints which led officers to engage in excessive force without fear of consequence.  Under this theory, Plaintiff's filing of the complaint after the incident is irrelevant; what matters is whether the City created a culture that encouraged its officers to trample on arrestees' rights.

Based on the evidence presented by Plaintiff regarding the City's custom of failing to adequately track complaints before the IA Pro system was instituted, there are genuine issues of material fact regarding the nature of the review of citizen complaints by TPD and the prosecutor's office as well as the implementation date of the IA Pro.[8]  These genuine issues of material fact preclude the award of summary judgment to the City Defendants.  As the Third Circuit held in <u>A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Ctr.</u>, 372 F.3d 572 (3d Cir. 2004), a defendant's "failure to establish a written policy and procedure

---

[8]     The City Defendants also take issue with the Court's comment in its prior decision that the Court was skeptical of the City's custom of not retrieving notices of excessive force tort claims which are filed pursuant to New Jersey's Tort Claims Act.  <u>See</u> N.J.S.A. 59:8-8.  In their motion, the City Defendants argue why it is appropriate for the City not to retrieve those notices.  Again, even assuming the City Defendants are correct, the decision not to retrieve tort claim notices has nothing to do with, and does not explain away, the City's failure to create a method for adequately tracking complaints.

for reviewing and following up on incident reports amounts to deliberate indifference, [and] a reasonable jury could conclude from [such] evidence that by failing to establish such a policy the [defendant] disregarded an obvious consequence of its action, namely, that [plaintiffs] could be at risk if information gleaned from the incident reports was not reviewed and acted upon." Id. at 583.  This same rationale applies here, where the City's failure to effectively track complaints disregards the obvious consequence of that failure—that arrestees may be at risk if officers know that citizen complaints will not be acted upon.[9]

The City Defendants further argue that Plaintiff has not presented sufficient evidence of a causal link between the alleged City custom and the injuries he sustained.  The City Defendants are correct that a plaintiff must present evidence of causation.  That evidence may come in the form of an expert report, id. at 582, or by demonstrating a "high degree of predictability" from which causation may be inferred.  Id. at 582-83.  Here, Plaintiff's evidence that the City failed to fully implement a system to effectively track excessive force complaints at the time of his incidents suggests that it was highly predictable that officers would not be deterred from using excessive force against arrestees.  As I explained in my prior opinion, "[i]f TPD officers are aware their conduct will most likely not be investigated and they will not be disciplined, it follows that they may run roughshod over the

_____

[9]       The Court is aware that A.M. involved a substantive due process claim brought under the fourteenth amendment as opposed to a fourth amendment claim, however, the A.M. court's deliberate indifference and causation analysis under Monell is instructive here.  See Studli v. Children & Youth And Families Central Regional Office, 346 Fed.Appx. 804, 810 (3d Cir. 2009) (equating the deliberate indifference analyses under the fourth and fourteenth amendments).

27

constitutional rights of citizens, as is alleged here." <u>Accord</u> <u>A.M.</u>, 372 F.3d at 583 (holding that failure to create a policy to track incident report was causally related to harm resulting from constitutional violations related to violations documented in those reports).

In sum, Plaintiff's evidence creates a genuine issue of material fact as to whether the City had a custom of failing to effectively track unprosecuted complaints of excessive force. For this reason, summary judgment relating to the November 8, 2004 is denied but granted as to the February 7, 2005 date.

### 2.      Failure to Discipline

It follows from my ruling on the City's failure to effectively track complaints, that there exists a genuine issue of material fact as to whether the City failed to discipline its officers.  If the City does not adequately track citizen complaints, a reasonable jury could likewise conclude that the City does not effectively discipline its officers.  While the City Defendants argue that more affirmative proof of a lack of discipline is required, Plaintiff cannot produce such evidence because the unprosecuted complaints were not consistently tracked by the City before, at best, late 2004.  As with the failure to adequately track claim, however, Plaintiff's failure to discipline claim must be limited to the November 8, 2004 incident.  Accordingly, summary judgment is not appropriate on this claim.

### 3.      Director Santiago

Plaintiff's claim against Director Santiago, found in Count IV of the Amended Complaint, sounds in supervisor liability.  There are two theories of supervisory liability applicable here.  The first theory involves Director Santiago in his role as policymaker for

28

the City, and the second theory involves his personal liability for either participating in violating Plaintiff's rights, directing others to violate them, or, as the person in charge, possessing knowledge of and acquiescing in his subordinates' violations. See Santiago v. Warminster Tp., 629 F.3d 121, 129 (3d Cir. 2010) (citing A.M., 372 F.3d at 586 n.5).

In terms of the first theory, "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." A.M., 372 F.3d at 586. Here, Defendants argue that Director Santiago did not become a policymaker until 2003 and that he is not responsible for any custom that existed when he began his tenure. However, a reasonable jury could conclude that Director Santiago's failure to implement a new policy until late 2004 still renders him accountable for the City's policy in effect at the time of November 2004 incident, but as discussed supra, he would not be responsible for the February 2005 incident. Accordingly, because there exists a jury question on whether the City's custom of ineffectively tracking and disciplining police officers caused Plaintiff's harm in connection with the November arrest, summary judgment in favor of Director Santiago in his official capacity as a policymaker is denied with regard to that incident but granted with respect to the February incident.

With regard to the second theory of supervisory liability, under that theory, Director Santiago may be personally liable if he participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and

29

acquiesced in his subordinates' violations.  Plaintiff has not presented sufficient evidence from which a jury could conclude that Director Santiago had notice of the November 2004 and February 2005 incidents, and it is undisputed that he did not participate in either incident.  Moreover, Director Santiago testified that he did not receive the Notice of Tort Claim filed by Plaintiff on February 5, 2005 for the November 2004 incident, and Plaintiff has not presented any countervailing evidence to suggest that Santiago did receive such notice.  Accordingly, there is no basis for holding Director Santiago liable on a personal liability theory and Plaintiff's claim against him is hereby limited to a claim based only upon Director Santiago's official role as a policymaker.  Cf. Warminster Twp., 629 F.3d at 132 (dismissing supervisor liability claim where plaintiff failed to alleges specific facts suggesting that officer directed his subordinates to engage in excessive force).

### 4.      Remaining Claims

Finally, the City Defendants argue that summary judgment should be granted on the malicious prosecution (false arrest) claim found in Count VI of the Amended Complaint as well as Count V of the Amended Complaint, which alleges that the City Defendants attempted to block Plaintiff's access to the courts.  Plaintiff does not oppose this aspect of the City Defendants' motion, accordingly, summary judgment is granted on those claims.

## IV.   CONCLUSION

For the reasons set forth above, the Officer Defendants' motion for summary judgment is granted in part and denied in part.  Summary judgment is denied on Plaintiff's excessive force claim, Count IV, against Defendants Rossetti, Fennimore, and Miller.

Summary judgment is granted on Count V of the Amended Complaint, and summary judgment is granted on the false arrest claim, Count VI, against Defendants Fennimore and Miller.  The false arrest claim against Defendant Rossetti remains.

As for the City Defendants' motion for summary judgment, that motion is also granted in part and denied in part.  Summary judgment is granted on Counts V and VI.  As to Count III, the claims against Director Santiago in his official capacity regarding the November 8, 2008 incident are denied but granted with regard to the February 7, 2005 incident; summary judgment is granted on all claims against Director Santiago in his individual capacity.  As for Count III against the City, summary judgment is denied on the November 8, 2008 incident but granted with respect to the February 7, 2005 incident.

Dated: December 27, 2011                         ___/s/ Freda L. Wolfson____
                                                 Freda L. Wolfson, U.S.D.J.